Myrtle Annie Segar, as Executrix of and Trustee under the Last Will and Testament of Elzie Crisler Segar, Deceased, Appellant, *v.* King Features Syndicate, Inc., Respondent.*

First Department, June 27, 1941.

*Jacob L. Holtzmann* of counsel [*David M. Holtzmann* and *Marvin M. Notkins* with him on the brief; *Fanny E. Holtzmann*, attorney], for the appellant.

*James Carroll* of counsel [*McCauley & Henry*, attorneys], for the respondent.

Untermyer, J. The defendant is engaged in the business of buying literary and artistic productions and selling them for use as features to various publications throughout the world. Elzie Crisler Segar, the cartoonist, was noted as the creator of " Popeye the Sailor " and other characters in the field of comic art. He commenced drawing cartoons for International Features Service, Inc., the defendant's predecessor, in 1919. His first contract with the defendant was made in 1921.

Segar's success as a cartoonist is reflected in the contracts which followed from time to time, under which different arrangements

* Modfg. and affg. 175 Misc. 25.

were entered into by separate agreements for weekly compensation and with respect to the ownership of the characters he created. His creations of " Popeye," " Olive Oyl " and other comics became very popular, especially with the younger generation, and met with a ready market. They appeared in newspapers printed in English and in foreign languages, with an aggregate daily circulation of approximately fifteen millions. Their antics have been depicted on the screen in animated cartoons, in children's programs on the radio, and in comic books. Toys and novelties have been manufactured in the form of their characters.

On April 7, 1932, Segar and the defendant entered into a contract covering the period from April 11, 1932, to July 14, 1938, which provided for the payment of weekly compensation of $500 for a portion of the period and $700 weekly for the last five years. Simultaneously the parties entered into an agreement under which the defendant conveyed and assigned to Segar " the toy, novelty, song and book rights to the characters appearing in the comic ' Thimble Theatre;' " and the defendant also agreed to act as Segar's representative in the sale of these rights " only so long as you desire us to do so " and to remit all sums received from sales. The defendant further agreed to pay Segar fifty per cent of all sums received from the sale of the moving picture, talking picture or theatrical rights. Thereafter by letter, dated December 28, 1932, Segar agreed to allow the defendant twenty-five per cent of the toy and novelty revenue to maintain a special department for the purpose of exploiting these rights.

On May 23, 1938, a new contract was entered into, consisting of a printed portion and a letter. By the printed form Segar was required to supply a specified number of drawings each week for a five-year period beginning July 14, 1938, and terminating July 13, 1943, for a compensation of $1,000 per week. Like the earlier contracts, it contained the following provision: " All literary, artistic or other materials and all drawings and articles furnished and produced by the said party of the second part resulting from any services rendered by him under this agreement, including all property rights in and to the characters that are the subjects of any drawings or articles of said party of the second part created under or exploited during the term of this agreement shall belong to and be the exclusive property of the party of the first part, who may duly protect the same by copyright or otherwise, and who shall have all the exclusive rights therein accorded to the author of a copyright work, as well as all of the property rights in and to such characters that may be accorded to the author or owner thereof under any law." Simultaneously with the execution of the printed

contract, the defendant by typewritten letter agreed to account to Segar to the extent of seventy-five per cent of all the moneys " actually derived by it from the licensing of other persons, firms or corporations to exercise toy, novelty, song and/or book rights * * * in and to the characters which heretofore have, and/or which hereafter may, appear in the comic strip feature entitled ' Thimble Theatre ' or ' Thimble Theatre—Starring Popeye,' " and to reserve for itself only twenty-five per cent of the moneys so derived. It further agreed to account to the extent of fifty per cent of all moneys actually derived from the licensing of others to exercise motion picture, talking picture, theatrical and radio rights utilizing these characters. The letter provided that the contract, upon execution, should be deemed to supersede their existing agreement contained in the letters of April 7, 1932, and December 28, 1932.

This agreement to account for the royalties was to begin on the date of the execution of the contract — May 23, 1938 — and to continue to July 13, 1943, " or so long as you perform your services under said contract." On October 13, 1938, Segar died. At that time there were outstanding license contracts which had been made both before and after May 23, 1938. Other license contracts were made by the defendant after Segar's death. The latter included renewals of contracts which were outstanding on October 13, 1938, and made both before and subsequent to May 23, 1938.

The defendant contended that Segar's death had terminated its obligations under the letter of May 23, 1938, and refused to account to his estate for royalties earned subsequent to the date of death, including royalties earned on licenses granted during Segar's lifetime. Thereupon this action for an accounting was commenced.

At the trial the plaintiff contended (1) that the death of Segar did not discharge the defendant from its obligation to account for royalties received previous to July 13, 1943, and (2) that even if the contract were considered to have terminated on October 13, 1938, the defendant was obligated to account for royalties derived from any contracts made prior to that date. The Special Term rejected the first contention, holding that the term of the contract ended with the death of Segar; and although it sustained in part the plaintiff's second contention, it limited the accounting to license agreements which were made between the date of the contract and the date of death. It held, in effect, that since Segar could no longer perform the printed contract which provided for the delivery of comic strips, his estate was not entitled to the benefit of license agreements entered into after his death. ·

Segar's death, of course, terminated the obligation for the delivery of drawings by him, and likewise terminated the defendant's obliga-

tion to make the corresponding weekly payments. At that time Segar had performed all the services and had delivered all the material on which the royalties have been earned or on which they will accrue. It is difficult to believe that the parties intended that Segar should be deprived of all interest in royalties if he died immediately after furnishing the productions on which the royalties were earned, even though nothing further remained to be done by him in relation to them. This applies with special force to royalties earned on productions which had been furnished under the contract of April 7, 1932, and were expressly subjected to the provisions of the contract of May 23, 1938. Concededly, under the earlier contract, Segar's estate would be entitled to such royalties notwithstanding his death. Yet it is contended that, for no apparent reason and greatly to Segar's detriment, these rights also were relinquished by subjecting them to the terms of the contract of May 23, 1938. In the absence of compelling language we should not attribute to the parties so unreasonable a purpose. (*Fleischman* v. *Furgueson*, 223 N. Y. 235.) If any doubt exists concerning the meaning of the contract we should rather ascribe to the parties a purpose to continue payment of royalties resulting from service which Segar had previously rendered, when the contract became impossible of further performance on account of his death. It is the settled rule that " into every contract of personal service the law reads ' the implied condition ' that sickness or death shall be an excuse for non-performance." (*Matter of Buccini* v. *Paterno Const. Co.*, 253 N. Y. 256.) Since Segar was excused from further performance of the contract, there is no reason to hold that his estate may not recover for royalties derived from licenses for those productions which had been delivered to the defendant before his death and exploited by it.

The defendant relies upon the phrase contained in the letter of May 23, 1938, that it will pay the percentages of royalties " so long as you [Segar] perform your services under said contract." It is asserted that since, by reason of his death, Segar can no longer perform services under the printed contract the defendant is excused from further payment of royalties on any of the productions which he had previously delivered. We are unable to give to this provision the interpretation for which the defendant contends. We think it was only intended to relieve the defendant from the duty to account for royalties under the letter of May 23, 1938, if Segar's non-performance constituted a breach of contract. In the absence of clear language it should not be extended to include a failure to perform which the law classifies as excusable on account of death or other cause. Such an interpretation would lead to most inequitable consequences by depriving the plaintiff

of that part of Segar's compensation which consisted of a share of the royalties on productions furnished previous to his death.

The interlocutory judgment so far as appealed from should be modified by directing the defendant to account for the percentages set forth in the letter of May 23, 1938, of all moneys derived from any licensing agreements entered into prior to July 13, 1943, and as so modified affirmed, with costs to the appellant.

MARTIN, P. J., DORE, COHN and CALLAHAN, JJ., concur.

Interlocutory judgment, so far as appealed from, unanimously modified by directing the defendant to account for the percentages set forth in the letter of May 23, 1938, of all moneys derived from any licensing agreements entered into prior to July 13, 1943, and as so modified affirmed, with costs to the appellant.